THOMPSON, Presiding Judge.
Julie P. Magee, in her official capacity as the Commissioner of Revenue of the State of Alabama,[1] and the State of Alabama Department of Revenue (collectively, “the Department”) appeal from a summary judgment entered by the Montgomery Circuit Court in favor of The Home Depot U.S.A., Inc. (“Home Depot”), reversing the Department’s denial of a refund of sales tax to Home Depot and awarding Home Depot a refund of sales tax in the amount of $266,672.93. For the reasons stated herein, we reverse the circuit court’s judgment.
The pertinent facts are undisputed. Home Depot operates retail home-improvement centers throughout the United States, including several in Alabama. In 1997, Home Depot entered into contracts with three related companies, General Electric Capital Corporation, GE Capital Financial, Inc., and Monogram Credit Card Bank of Georgia (collectively, “the finance companies”), for the provision of private-label credit cards to its customers (“the PLCC program”). Under the PLCC program, the finance companies provided customers of Home Depot with the opportunity to make purchases from Home Depot on credit. If a Home Depot customer decided to make a purchase utilizing the PLCC program, the customer would apply to one of the finance companies for credit. The finance company would evaluate the applicant’s creditworthiness and, in its sole discretion, decide whether and to what extent to offer credit to. the customer for making purchases at Home Depot. If the finance company approved the customer’s application, it would establish a credit account for the customer. When the customer made a purchase, the finance company would forward the amount of the customer’s purchase, including applicable taxes, less a service fee, to Home Depot for payment of the purchase. From this amount, Home Depot would pay the applicable sales tax to the appropriate governmental entity or entities. Home Depot deducted the service fee on its federal income-tax returns as a credit-card discount.
After the establishment of a credit account with one of the finance companies, a Home Depot customer utilizing the PLCC program would deal exclusively with the finance company with regard to payment of the account. The finance companies had the right to charge interest and fees on the credit accounts. Pursuant to the contracts between Home Depot and the finance companies, the finance companies were the sole and exclusive owners of all the credit accounts they established for Home Depot’s customers. In a situation in which a customer failed to pay off his or her credit account with one of the finance companies, the contracts provided that the *784 finance companies would bear that loss and that they were not permitted to pass on those losses to Home Depot.[2] The finance companies deducted those losses as bad debt on their federal corporate income-tax returns. In July 2003, a different company succeeded the finance companies as the issuer of Home Depot’s private-label credit cards.
On October 20, 2003, Home Depot filed a petition with the Department for a refund of $610,449.84 of sales tax it had paid from September 2000 to July 2003 for its customers who had participated in the PLCC program and who had defaulted in their obligations to repay the amount of the purchases they had financed with the finance companies. Home Depot relied on Ala. Admin. Code (Dep’t of Revenue), r. 810-6-4-.01 (“the bad-debt regulation”), which provides for a refund of sales tax paid by a retailer on credit accounts that are charged off as uncollectible for federal-income-tax purposes.
In a letter dated October 18, 2004, the Department denied Home Depot’s refund petition. In denying the petition, the Department took the position that gross receipts from sales that were paid for by credit cards were taxable on the full selling price. The letter from the Department stated that, if Home Depot wanted to pursue the matter further, it could request a formal hearing before an administrative law judge within two years of the date of its receipt of the letter or file an appeal directly to circuit court.
On September 22, 2006, Home Depot filed a notice of appeal to the Department’s Administrative Law Division, requesting a formal hearing. The Department filed a motion to dismiss the appeal for lack of jurisdiction because, it argued, Home Depot’s appeal was untimely. It argued that, pursuant to § 40-2A-7(c)(3), Ala.Code 1975, Home Depot’s petition for a refund had been denied by operation of law six months after it had been filed (i.e., on April 20, 2004) and, as a result, that the two-year period in which to file an appeal had expired on April 20, 2006, five months before Home Depot filed its notice of appeal. Ultimately, the administrative law judge (“the ALJ”) held that the Department was estopped from asserting that Home Depot’s appeal was untimely because the Department had affirmatively represented to Home Depot that it had two years from the date of its receipt of the letter of October 18, 2004, denying Home Depot’s refund petition in which to file its appeal to the Administrative Law Division.
On November 20, 2007, the ALJ held a hearing on Home Depot’s refund petition. Much of the testimony at the hearing focused on the service fee the finance companies charged Home Depot on its customers’ credit purchases under the PLCC program. Although it was acknowledged at the hearing that the contracts between Home Depot and the finance companies did not list the various elements that the finance companies and Home Depot considered in determining the amount of the service fee to be charged to Home Depot, testimony indicated that the finance companies attempted to estimate the amount of bad debt that would be generated as part of the PLCC program and that they set the service fee based, in part, on that estimate. Eugene Joseph Thorncraft, Jr., the vice president of risk management for General Electric Consumer Finance Division in America, testified as follows regarding how the finance companies deter *785 mined the amount of the service fee to charge Home Depot when negotiating the contracts with Home Depot:
“[W]hen we negotiate a deal, we make a series of assumptions. We take a look at what our through-the-door populations are going to look like, or what the customers look like when they come through. We make a determination of how they are going to spend. How many are going to revolve and pay interest so we can determine a cash flow. We will know what our interest rates are. We will know how many will go delinquent so we can know what our late fee stream will be. Any other sundry income stream would be incorporated into that. We also then take a look at what our costs are going to be. Money costs, operating expense, bad debts, et cetera. From there we get a, kind of a portfolio level income stream. From that, we determine what our threshold of profitability should be. And based on that, we would assess fees to — we would set the service fee so we assess that fee to the retailer.”
Thorncraft stated that “bad debt is a critical element in the economic profile.” He also stated that the finance companies made a profit under the PLCC program and that their estimates with respect to anticipated bad debts were very close to the actual amount of bad debts they experienced under the program. Testimony at the hearing indicated that the service fee Home Depot paid the finance companies did not vary from customer to customer based on the customer’s creditworthiness.
At the hearing, Home Depot indicated that it had reduced its refund request to include only state sales taxes and Department-administered local sales taxes. The amended refund amount Home Depot requested was $383,341.29.
In its post-hearing briefs, Home Depot stated that it was entitled to a refund of sales tax because it had demonstrated the applicability of the bad-debt regulation to its refund petition. Particularly, Home Depot argued that it had paid the sales tax on the credit sales at issue and that the credit accounts associated with those sales had become uncollectible and were written off as bad debt. Home Depot argued, alternatively, that if the ALJ concluded that the only entity entitled to claim a refund under the bad-debt regulation is the entity that took a deduction for the bad debt on its income-tax returns, Home Depot qualified for the refund because it had fully compensated the finance companies for the bad debt they had incurred under the PLCC program by virtue of the service fee it had paid to the finance companies. Home Depot pointed to evidence at the hearing demonstrating that the future bad debt the finance companies would incur under the PLCC program was specifically considered in setting the amount of the service fee. Finally, Home Depot argued that denial of its refund petition would result in unjust enrichment to the State of Alabama because the Department would be retaining a greater amount of sales tax than Home Depot’s customers who defaulted on their obligations under the PLCC program had actually paid.
In its post-hearing brief, the Department argued that it had properly denied Home Depot’s refund petition because the finance companies, not Home Depot, owned the bad debt underlying Home Depot’s petition and the finance companies, not Home Depot, had written off the bad debt on their income-tax returns. The Department contended that Home Depot had received full payment from the finance companies for the PLCC-program transactions and that the finance companies did not transfer their bad debt arising under the PLCC program to Home Depot. It *786 argued that, if Home Depot was allowed to recover the sales tax it had paid on the bad debts owned by the finance companies, Home Depot would realize more profit on the credit transactions than it would have had the customers simply paid in cash. The Department argued that the bad-debt regulation did not apply to Home Depot’s petition.
On June 6, 2008, the ALJ entered a detailed final order affirming the Department’s denial of Home Depot’s refund petition. The ALJ concluded that the bad-debt regulation did not apply to Home Depot’s refund petition; he construed the regulation as applying only in circumstances where the retailer itself makes the credit sale, not in circumstances involving credit-card sales “where credit is extended to the customer by a third party finance company, as in this case.” The ALJ also rejected Home Depot’s alternative argument that it was due the refund it sought because it had reimbursed the finance companies for their bad debt by paying them the service fee. The ALJ concluded that the amount of the service fee attributable to the estimate of bad debt to be incurred by the finance companies under the PLCC program could not be determined and that, “[e]ven if it is assumed that the fees included a bad debt component equal to the estimated bad debt amounts, ... the bad debts actually incurred by the [finance companies] may have been (or could be in the future) much greater than anticipated,” thus allowing Home Depot to claim a larger refund of sales taxes than had been reflected in the service fee it had paid to the finance companies. The ALJ also held that Home Depot could not prove the amount of Alabama sales tax it had paid on the bad debts because it could not prove that all of those sales had occurred in Alabama and that Home Depot could not demonstrate the amount of local sales tax it had paid on the bad debts to the local jurisdictions in Alabama administered by the Department. Thus, the ALJ affirmed the Department’s denial of Home Depot’s refund petition.
Home Depot filed an appeal of the Department’s determination to the Montgomery Circuit Court pursuant to § 40-2A-9(g)(1); Ala.Code 1975. In January 2009, Home Depot and the Department filed cross-motions for a partial summary judgment on the issue whether Home Depot was entitled to the refund of sales taxes for which it had petitioned. Reversing the ALJ’s determination, the circuit court granted Home Depot’s summary-judgment motion and denied the Department’s summary-judgment motion. The circuit court held that Home Depot had satisfied all the requirements of the bad-debt regulation and, as a result, that Home Depot was entitled to a refund of sales taxes paid on bad debt under that regulation. The Department filed an appeal, which this court dismissed as having been taken from a nonfinal judgment.
After this court dismissed the Department’s appeal, Home Depot filed a motion for a summary judgment as to the amount of the refund due. In its motion, Home Depot sought a refund amount of $266,672.98, reflecting a substantial reduction in the refund amount it had previously sought. Home Depot stated that it had reduced the amount of the sales-tax refund it was requesting “in an attempt to eliminate all questions regarding [its] data and calculations.” This new amount, according to Home Depot, reflected its elimination from its refund claim of: (1) local sales tax; (2) sales tax paid on bad debts resulting from purchases made by Alabama account holders at Home Depot’s stores located outside of Alabama; and (3) sales tax paid on bad debts that were subsequently paid by customers after having been taken as *787 bad-debt deductions by the finance companies.
On March 15, 2011, the circuit court granted Home Depot’s motion and entered a summary judgment in its favor, awarding it the refund of sales tax that it sought. Because the summary judgment disposed of the remaining issue before the circuit court, that judgment constituted a final judgment. See Furin v. City of Huntsville, 8 So.3d 256, 260 (Ala.Civ.App.2008). The Department filed a timely appeal to this court.
Athough neither party has argued that this court is without jurisdiction, we first consider that question ex mero motu. See Ex parte Smith, 438 So.2d 766, 768 (Aa.1983). As previously noted, Home Depot filed its request for a refund on October 20, 2003. Because the Department did not act on Home Depot’s petition within six months of its filing, i.e., by April 20, 2004, the petition was deemed denied by operation of law. See § 40-2A-7(c)(3), Ma.Code 1975. However, after that date, the Department and Home Depot continued corresponding with one another relative to the refund petition. Finally, on October 18, 2004, the Department sent a letter to Home Depot stating, in pertinent part:
“On October 20, 2003, this department received the above referenced petition for refund of State Sales Tax.
“After a thorough investigation of your refund claim by our Foreign Audit Section and a decision made by Judge Thompson, (ALJS. 91-203) gross receipts derived from sales paid for by credit card are taxable on the full selling price. There would be no bad debt deductions even if the credit card company later determined the debt to be uncol-lectible.
“For this reason, we have no alternative but to deny your refund request.
“If you wish to pursue this matter further, you may request a formal hearing before an [ALJ] within two years from the date you receive this letter or you may appeal directly to circuit court. If you desire a hearing before an [ALJ], you must file Notice with the Aabama Department of Revenue, Administrative Law Division, P.O. Box 320001, Montgomery, Aabama 36132-0001.”
Home Depot filed its notice of appeal seeking a hearing with the ALJ on September 22, 2006, which was less than two years after its receipt of the Department’s letter but more than two years after its petition had been deemed denied by operation of law. We note that the timely filing of a notice of appeal from the denial of a refund petition is a prerequisite to an ALJ’s exercise of jurisdiction over the appeal. See § 40-2A-7(c)(5), Aa.Code 1975.
As noted, the Department filed a motion to dismiss the appeal to the Administrative Law Division as untimely. Initially, the ALJ granted that motion. Home Depot filed a motion for a rehearing, asserting that it had relied in good faith on the information provided by the Department in its October 18, 2004, letter, relative to the denial of its refund petition and the time for the taking of an appeal from that denial. In a detailed order, the ALJ granted Home Depot’s motion for a rehearing and reinstated its appeal, writing, in pertinent part:
“The Administrative Law Division initially granted the Department’s motion to dismiss for lack of jurisdiction because [Home Depot] failed to appeal within two years from when [Home Depot’s petition was deemed denied. [Home Depot] contends on rehearing, however, that the appeal should not be dismissed because it received an October 18, 2004, letter from the Department *788 that stated that the refund was being denied, and that [Home Depot] had two years from that date to appeal. The letter specified that ‘[i]f you wish to pursue this matter further, you may request a formal hearing before an Administrative Law Judge within two years from the date you receive this letter.... ’ [Home Depot] claims that it relied in good faith on that information, and that its'appeal filed within two years of the October 18, 2004, letter should be accepted as timely.
“The Department does not dispute that the October 18, 2004, letter notified [Home Depot] that it had two years from that date to appeal. It contends, however, that the letter was a nullity, and could not extend or waive the two year statute of limitations for appealing. It also argues that it cannot be estopped from asserting the statutory time limit as a bar to the [Home Depot]’s refund claim. I disagree.
“Alabama’s Supreme Court has consistently held that the Revenue Department cannot be estopped from assessing and collecting a tax that is legally due. Community Action Agency of Huntsville, Madison County, Inc. v. State, 406 So.2d 890 (Ala.1981); State v. Maddox Tractor & Equipment Co. 260 Ala. 136, 69 So.2d 426 (1953). The Court has also held, however, that the State may be estopped from asserting that a taxpayer failed to timely appeal ‘where the untimeliness of the filing of their appeal was caused by misinformation furnished by the State’s officer and relied upon by the petitioners to their detriment.’ Ex parte Four Seasons, Ltd., 450 So.2d 110, 112 (Ala.1984). The rationale of Ex parte Four Seasons applies in this case.
“In Ex parte Four Seasons, the county tax assessor notified the petitioners that the county board of equalization had ruled on their protest on October 20, 1982. The petitioners were required by statute to appeal that decision to the circuit court within 30 days. They appealed on November 18, within 30 days from October 20.
“The State moved for [a] summary judgment because the board had actually denied the petitioners’ protest on or before October 4, 1982. Consequently, the petitioners had failed to appeal within 30 days from when the protest had actually been denied. The trial court and the Court of Civil Appeals held that the appeal must be dismissed as untimely-
“The Supreme Court reversed. ‘In the case before us, the secretary’s active misrepresentation of the date of the board’s decision is being used in an attempt to deny the taxpayers, who relied on it, their right to an appeal to a court of law. Such a result would obviously work a serious injustice. Furthermore, the public’s interest would not be unduly damaged by the imposition of estoppel in this case.’ Ex parte Four Seasons, 450 So.2d at 112.
“The Supreme Court subsequently applied its rationale in Ex parte Four Seasons in Talladega Board of Education v. Yancy, 682 So.2d 33 (Ala.1996); Ex parte Tanner, 553 So.2d 598 (Ala.1989); and Ex parte State Dept. of Human Resources, 548 So.2d 176 (Ala.1988). Likewise, the Court of Civil Appeals adopted the rationale of Ex parte Four Seasons in City of Mobile v. Sumrall, 727 So.2d 118 (Ala.Civ.App.1999), and Wallace v. Moore, 684 So.2d 161 (Ala.Civ.App.1996). The above cases establish that if a governmental employee acting in his or her official capacity gives an individual or an entity erroneous information that is relied on in good faith by the individual or entity, and which directly results in the individual or enti *789 ty failing to timely appeal, the government is estopped from asserting the statute of limitations as a defense.
“In this case, [Home Depot] and the Department actively communicated concerning [Home Depot]’s refund claim after [Home Depot] filed its petition in October 2003. [Home Depot] submitted two letters to the Department on March 17, 2004, which provided additional information and/or documents concerning the refund claim, as requested by the Department. [Home Depot] later sent a June 21, 2004, letter to the Department that provided more information concerning its refund claim, again as requested by the Department. The above correspondence confirms that [Home Depot] had reason to believe that the Department was actively considering its refund claim up to when the Department notified [Home Depot] in writing on October 18, 2004, that its petition had been denied.
“Importantly, the Department’s October 18 letter also informed [Home Depot] that it had two years from that date to appeal. The Department is required to notify a taxpayer in writing within six months whether a petition has been granted or denied. Code of Ala.1975, § 40-2A-7(e)(3). The Department failed to do so in this ease. Consequently, the petition was deemed denied by operation of law six months after it was filed, or on April 20, 2004. See again, § 40-2A-7(c)(3). The Department was not thereafter required to notify [Home Depot] that the refund had been denied. It did so, however, pursuant to its October 18, 2004, letter. It also informed [Home Depot] in the letter that it had two years from that notice date to appeal.
“In Ex parte Tanner, supra, the probate court issued a condemnation order on May 8, 1984, but incorrectly notified the property owners that the order had been entered on May 22. The owners appealed within 30 days from May 22, but more than 30 days from when the order was actually entered. The Supreme Court, relying on its prior decisions in Ex parte Dept of Human Resources and Ex parte Four Seasons, held that ‘[although the probate court was not required to send the Tanners notice, once it did, they were entitled to rely on the date assigned’ to the condemnation order. Ex parte Tanner, 553 So.2d at 599.
“The above rationale applies in this case. The Department was not required to send [Home Depot] the October 18, 2004, letter notifying it that the petition was being denied because the petition had already been deemed denied by operation of law on April 20, 2004. It nonetheless did so, and also informed [Home Depot] that it had two years from that date to appeal. If the Department had not sent [Home Depot] the October 18 denial letter, the burden would have been on [Home Depot] to determine how long it had to appeal, i.e., two years from when the petition was deemed denied. But because the Department sent the October 18 letter and informed [Home Depot] that it had two years from that date to appeal, [Home Depot] was entitled to rely on that information.
“Estoppel would not apply if the Department had notified [Home Depot] after the appeal period had expired that it still had time to appeal. That is, an appeal period cannot be revived after it has expired. In this case, however, as in Ex parte Four Seasons and the other cases cited above, the erroneous information was provided while the appeal period was still open. But for the erroneous information, [Home Depot] could have appealed within two years from *790 when the petition was deemed denied. It did not do so based on its reliance on the Department’s October 18, 2004, letter, which indicated that [Home Depot] had two years from that date to appeal. As in Ex parte Four Seasons, to not allow [Home Depot] to pursue its appeal “would obviously work a serious injustice. Furthermore, the public interest would not be unduly damaged by the imposition of estoppel in this case.’ Ex parte Four Seasons, 450 So.2d at 112.
“Estoppel would not, of course, apply in all cases where a Department employee gives a taxpayer erroneous advice concerning the taxpayer’s appeal rights. Rather, it must be applied (or rejected) on a case-by-case basis. For estoppel to apply, the advice or information must seem reasonable on its face, and the taxpayer must rely on the advice or information in good faith. The October 18, 2004, letter informing [Home Depot] that it had two years to appeal was reasonable on its face, especially considering that the Department and [Home Depot] had actively communicated concerning the refund claim even after the refund was deemed denied in April 2004. [Home Depot] also relied on the erroneous information in good faith. Estoppel applies under the facts of this case.”
We agree with the ALJ’s analysis of the issue of the timeliness of Home Depot’s appeal to the Administrative Law Division, and, like the ALJ, we hold that the Department, because of its October 18, 2004, letter, was estopped from asserting that the ALJ lacked jurisdiction to consider Home Depot’s appeal. As a result, we conclude that there are no jurisdictional impediments to our consideration of the present appeal.
We turn now to the merits of the Department’s appeal. The standard of review appropriate to this appeal was set forth in State Department of Revenue v. Wells Fargo Financial Acceptance Alabama, Inc., 19 So.3d 892 (Ala.Civ.App. 2008):
“Although the order of an ALJ is to be presumed prima facie correct in an appeal of that order in the circuit court, Ala.Code 1975, § 40-2A-9(g)(2), this court’s standard of review does not require that it give deference to either the ALJ’s decision or the circuit court’s judgment. Instead, because this is an appeal from a summary judgment and involves only questions of law, our review of the matter is de novo. State Dep’t of Revenue v. Gamer, 812 So.2d 380, 382 (Ala.Civ.App.2001). Because we are concerned with the application of tax statutes, we must be mindful of the principles governing their construction. ‘It is well settled that the right to reclaim money voluntarily paid to the state or the counties thereof, as taxes, is a creature of legislative grace.... ’ Lee v. Cunningham, 234 Ala. 639, 642, 176 So. 477, 480 (1937) (opinion on rehearing). Like tax exemptions, tax refunds are to be construed in favor of the taxing authority. Smith v. Sears, Roebuck & Co., 672 So.2d 794, 799 (Ala.Civ.App.1995); see also Ex parte Jefferson Smurfit Corp., 951 So.2d 659, 665 (Ala.2006) (stating that the right to a franchise-tax refund is a matter of legislative grace).”
19 So.3d at 894. We also note that “[t]his court and the trial court must give substantial deference to an agency’s interpretation of its rules and regulations” and that “ ‘[a]n agency’s interpretation of its own regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.’ ” Mobile Cnty. Pers. Bd. v. Tillman, 751 So.2d 517, 518 (Ala.Civ.App.1999) (quoting Ferlisi v. Alabama Medicaid Agency, 481 So.2d 400, 403 (Ala.Civ.App.1985)).
*791 In Wells Fargo, we provided the following background of Alabama tax law as it relates to the bad-debt regulation:
“Subject to certain exceptions not applicable here, a sales tax is levied on ‘every person, firm, or corporation, ... engaged or continuing within this state, in the business of selling at retail any tangible personal property whatsoever....’ Ala.Code 1975, § 40-23-2(1). Those persons or entities who meet the definition in § 40-23-2(1) are considered ‘taxpayers.’ § 40-23-1(a)(7) (defining taxpayer for purposes of the section as ‘[a]ny person liable for taxes hereunder’). Taxpayers must be licensed, § 40-23-6, and must pay the sales tax due on their gross receipts monthly. § 40-23-7(a); but see § 40-23-7(d) (permitting quarterly reports for those whose average sales-tax liability is under $200 per month). In addition, a taxpayer must keep records of its ‘gross sales, gross proceeds of sales, and gross receipts or gross receipts of sales’ and any other records necessary to compute the amount of sales tax due. § 40-23-9. The sales tax due on cash sales is to be computed and remitted monthly, § 40-23-7(a), while the sales tax due on credit sales is to be computed on each installment paid to the taxpayer. § 40-23-8. According to § 40-23-8, ‘in no event shall the gross proceeds of credit sales be included in the measure of the tax to be paid until collections of such credit sales shall have been made.’
“Because on some credit sales taxpayers were remitting the sales tax, which was later discovered not to be due because a portion of the purchase price was deemed to be uncollectible, the Department promulgated an administrative regulation that would allow a retailer to seek a refund of, or take a credit on a subsequent sales-tax report for, those sales taxes paid on certain qualifying uncollectible accounts. Ala. Admin. Code (Dep’t of Revenue), r. [810J-6-4-.01.”
19 So.3d at 894-95.
Regulation 810-6-4-.01, the bad-debt regulation, provides, in relevant part:
“(1) The term ‘bad debt or uncollectible account’ as used in this rule shall mean any portion of the sales price of a taxable item which the retailer cannot collect. Bad debts include, but are not limited to, worthless checks, worthless credit card payments, and uncollectible credit accounts. Bad debts, for sales and use tax purposes, do not include finance charges, interest, or any other nontaxable charges associated with the original sales contract, or expenses incurred in attempting to collect any debt, debts sold or assigned to third parties for collection, or repossessed property.
[[Image here]]
“(3) The term ‘credit sale’ shall include all sales in which the terms of the sale provide for deferred payments of the purchase price. Credit sales include installment sales, conditional sales contracts, and revolving credit accounts.
“(4) Sections 40-23-8 and 40-23-68(e), Code of Ala.1975, require that any person taxable under the law having cash and credit sales may report the cash sales, and the retailer shall include in each report all credit collections made during the preceding tax reporting period and shall pay the taxes due on the cash sales and the credit collections at the time of filing the tax report, but in no event shall the gross proceeds of credit sales be included in the measure of tax to be paid until collections of the credit sales have been made.
“(5) In the event a retailer reports and pays the sales or use tax on credit accounts which are later determined to be *792 uncollectible, the retailer may ... obtain a refund for any tax paid with respect to the taxable amount of the unpaid balance due on the uncollectible credit accounts within three years following the date on which the accounts were charged off as uncollectible for federal income tax purposes.
“(6) If a retailer recovers in whole, or in part, amounts previously claimed as bad debt credits or refunds, the amount collected shall be included in the first tax report filed after the collection occurred. (Sections 40-23-8 and 40-2S-68(e))”
On appeal, the Department contends that Home Depot does not meet the requirements under the bad-debt regulation to seek a refund of sales tax. It argues that the regulation does not extend to credit-card transactions like those at issue in this case but that it applies only to retailers that extended credit directly to their customers. The Department argues that, because Home Depot did not extend credit to its customers who utilized the PLCC program and subsequently defaulted on their obligations to the finance companies, the bad-debt regulation does not permit Home Depot to obtain the refund it requests.
Home Depot responds that to be entitled to a refund of sales tax under the regulation, a retailer need only show that it reported and paid sales tax on credit accounts that were later determined to be uncollectible. It argues that it has met that standard in the present case because it reported and paid sales tax on the purchases its customers made on sales financed by the finance companies and it sought a refund with respect to those purchases that were subsequently written off as bad debt after the customers’ credit accounts were determined to be uncollectible. Home Depot asserts that the plain language of the regulation does not require that the retailer be the entity that extended credit to the purchaser. According to Home Depot, it is the retailer’s status as a taxpayer, not as a creditor, that allows a retailer to obtain a refund of sales tax paid on bad debt.
Given this court’s obligation to construe the bad-debt regulation in favor of the Department, see Wells Fargo, 19 So.3d at 894, as well as the substantial deference this court owes to the Department’s interpretation of its own regulations, see Mobile County Pers. Bd., 751 So.2d at 518, we conclude that the Department’s interpretation of the bad-debt regulation is correct. As the Department notes, the first sentence of subsection (1) of the regulation defines “bad debt or uncollectible account” as the portion of the sales price of a taxable item that the retailer cannot collect. In situations like the present case, involving third-party financing, the bad debt at issue does not relate to the retailer and is not a portion of the sales price of a taxable item that the retailer cannot collect. Instead, with regard to all the purchases giving rise to the bad debt at issue, Home Depot was not owed any amount of money by its customers, because it had been paid for those purchases up front by the finance companies.
Home Depot argues that subsection (1) of the bad-debt regulation does not limit bad debts to those incurred only by retailers because that subsection includes “worthless credit card payments” within the definition of “bad debt.” Home Depot fails to demonstrate, however, that the credit-card payments at issue in the present case were “worthless.” Indeed, at the time of each sale at issue in the present case, Home Depot received full payment from the finance companies for the items being purchased; such a transaction hardly involves a “worthless payment” from the finance companies. In our view, to consti *793 tute á “worthless credit card payment,” the payment made to the retailer must have, in fact, been worthless, much like a worthless check payment (also included within the definition of “bad debt” in subsection (1) of the regulation). The situation in the present case simply does not involve “worthless payments” as contemplated by the bad-debt regulation.
Subsection (3) of the bad-debt regulation defines “credit sale” as including “all sales in which the terms of the sale provide for deferred payments of the purchase price.” In the present ease, the “terms of the sale” between Home Depot and its customers did not “provide for deferred payments of the purchase price.” Instead, Home Depot was paid the entire purchase price plus sales tax, less a service fee, at the time of each sale. Thus, as to Home Depot, the sales at issue did not constitute “credit sales.” We recognize, as Home Depot argues, that the term “credit sale” is defined in the second sentence of subsection (3) to include, among other things, “revolving credit accounts,” which, Home Depot asserts, are the types of accounts at issue in the present case. However, as discussed, we construe the first sentence of subsection (3) as excluding from the scope of the definition those sales in which the retailer is paid for the purchase at the time of the sale, whether by the purchaser or by a finance company. Thus, the “revolving credit accounts” listed in the second sentence of subsection (3) necessarily refer to accounts owned by the retailer, not to those owned by a third-party finance company.
Finally, subsection (6) of the bad-debt regulation, like subsection (1), refers to a retailer’s collection of amounts due in a credit sale. This subsection again implies that the bad debt at issue is debt owned by the retailer itself because, in situations involving the third-party financing of purchases from a retailer, a retailer would not be in a position to “recover[ ] ... amounts previously claimed as bad debt credits or refunds.” Instead, in such situations, only the finance company would be in such a position.
Reading all of these subsections of the bad-debt regulation together, we conclude that subsection (5) of the bad-debt regulation, which provides for a refund of sales taxes paid on credit sales that are subsequently charged off as bad debt for income-tax purposes, does not apply in circumstances where, as in the present case, the retailer is not the entity that charged off the bad debt. Instead, we agree with the ALJ’s conclusion that, “[w]hen read together and in context, the various paragraphs in the [bad-debt] regulation clearly envision that the retailer must extend credit to the customer and own the account, and that if the account is not paid, the retailer must be the party that deducts the debt as uncollectible.”
Our conclusion as to the appropriate construction of the bad-debt regulation comports with the construction by other courts of their jurisdictions’ bad-debt-refund laws. For example, in In re Sales Tax Claim for Refund of Home Depot, 198 P.3d 902 (Okla.Civ.App.2008), the Court of Civil Appeals of Oklahoma was asked to construe, under circumstances virtually identical to those of the present ease, a tax-refund statute (Okla.Stat.tit. 68, § 1366) that read, in pertinent part:
“ ‘Taxes paid on gross receipts represented by accounts receivable which, on or after December 31, 1990, are found to be worthless or uncollectible and that are eligible to be claimed ... as a deduction pursuant to Section 166 of the Internal Revenue Code ... may be credited upon subsequent reports and remittances of the tax levied in this article, in accordance with the rules and *794 regulations of the Tax Commission. If such accounts are thereafter collected, the same shall be reported and the tax shall be paid upon the amount so collected.’ ”
198 P.3d at 903. The court gave the same construction to this statute as we presently give to the Department’s bad-debt regulation. Specifically, it held that a retailer, to be entitled to a refund of sales tax under the statute, must have been the entity that deducted the bad debt on its income-tax returns:
“[The taxpayer] could not satisfy its burden of proving a right to a refund of sales tax under that statute. Section 1366 implicitly requires the owner of the bad debt account to be the entity allowed the deduction where it also requires the owner to report subsequent collections of bad debt accounts as income.”
198 P.3d at 904 (emphasis added). See also Home Depot USA, Inc. v. State Dep’t of Revenue, 151 Wash.App. 909, 922, 215 P.3d 222, 228-29 (2009) (construing a similar tax-refund statute under similar facts and concluding that, “[ajlthough the tax refund statute at issue does not explicitly contain a requirement that bad debts be deductible by the refund claimant, analysis of related federal and state tax laws demonstrates that the party seeking the deduction must be the one holding the bad debt as well as the one to whom repayment on such a debt would be made”).
Furthermore, our conclusion as to the proper construction of the bad-debt regulation follows logically from this court’s decision in Wells Fargo. In that case, several companies (“the credit companies”) financed the sales by multiple retailers of a number of different items. The items were sold on credit pursuant to installment sales contracts entered into between the retailers and their customers. The retailers then assigned the contracts to the credit companies in exchange for payment from the credit companies of the entire amount of the purchase plus applicable sales tax, after which the retailers remitted the sales tax collected to the Department. After a number of customers failed to pay for their purchases under the installment sales contracts, the credit companies, pursuant to the bad-debt regulation, sought refunds of the amount of sales tax they had paid on those contracts. The Department denied the refunds. The circuit court reversed that denial and awarded the credit companies the requested refunds. The Department appealed to this court.
On appeal, this court rejected the credit companies’ argument that the assignment of rights under the installment sales contracts to the credit companies included an assignment to them of any rights the retailers would have had to refunds pursuant to the bad-debt regulation. Wells Fargo, 19 So.3d at 897-99. Instead, we concluded that such rights were not subject to assignment. Id. We also concluded that, even if the right to a refund under the bad-debt regulation was amenable to assignment, such a right did not exist in that case:
“In each transaction, at the time of the assignment of the installment sales contract and all the rights thereunder, the retailer received the full purchase price and all the sales tax due on the retail sale. No other payments were due to the retailer from the purchaser or the credit company. The retail sale, as far as the retailer was concerned, was concluded. The retailer was required to report the proceeds from that retail sale and to compute and remit the sales tax due on that retail sale on its monthly sales-tax report. §§ 40-23-7 & -8. The retailer, at the time of the assignment of the installment sales contract, *795 did not have the potential for and would never have the potential for an uncol-lectible account arising from that reported retail sale. The sales tax collected on that retail sale and remitted to the Department was not an overpayment of tax, because sales tax was due on the entire purchase price when it was paid to the retailer. §§ 40-2B-7 & -8. The retailer’s ‘right’ to a refund under the ‘bad debt’ regulation was not a contingent right that could be assigned; it was a right that never came into being and would never come into being. The retailer would never qualify for a refund under the ‘bad debt’ regulation because it did not pay sales tax on installments due on a credit account; instead, it received the entire purchase price at the time of the retail sale, which required the payment of all sales tax due at that time. See Department of Revenue v. Bank of America, NA., 752 So.2d [637] at 642 [ (Fla.Dist.Ct.App.2000) ]; In re Petition of General Elec. Capital Corp. (DTA No. 816785, Dec. 27, 2001) (N.Y. Tax App. Trib.2001) (not published); see also 29 Richard A. Lord, Williston on Contracts § 74:1, at 206 (4th ed.2003) (stating, in a discussion of assignments of a chose in action, that ‘the assignee acquires rights similar to those of the assignor, and is put in the same position with reference to those rights as that in which the assignor stood at the time of the assignment’).”
Id. at 899.
Home Depot seeks to distinguish Wells Fargo on the basis that, unlike the retailers in that case, Home Depot “did not receive the full purchase price plus sales tax for [the] PLCC transactions.” This, in our view, is an immaterial distinction. The ALJ rejected any notion that Home Depot’s payment of a service fee to the finance companies (and, therefore, its receipt of less than the entire purchase price of the financed purchases) conferred on Home Depot a right to seek a refund under the bad-debt regulation:
“Home Depot argues in the alternative that it is entitled to a refund because a bad debt component was included in the fees it paid to the [finance companies], and consequently, it suffered the economic loss for the bad debts. Home Depot claims that it ‘fully compensated [the finance companies] for worthless (Home Depot card) accounts through the service fee and other consideration.’ Home Depot’s Post-Hearing Brief at 21. I disagree.
“The agreements between Home Depot and the [finance companies] included only the fee percentages, and did not specify how the percentages were determined. Several witnesses testified, however, that the parties estimated and considered the expected bad debt amounts when negotiating the fee amounts. But there is no evidence showing the amount or what part of the fees constituted a bad debt component. Consequently, there is no proof that the fees included a bad debt component that fully compensated the [finance companies] for the actual bad debts.
[[Image here]]
“Even if it is assumed that the fees included a bad debt component equal to the estimated bad debt amounts, which, as discussed, cannot be established, the bad debts actually incurred by the [finance companies] may have been (or could be in the future) much greater than anticipated. For example, assume that the [finance companies] estimated that during a given period x amount of the accounts would become uncollectible. Assume further that it included that x amount as a bad debt component in the fees. Due to an unexpected economic *796 downturn, however, the actual bad debt amount was xxx. Applying Home Depot’s rationale, it would be entitled to a sales tax refund based on xxx amount, even though it had paid the [finance companies] a bad debt component in the fee, i.e., had suffered an economic loss, of only x amount. Clearly, that cannot be allowed.
“Home Depot asserts that the fees fully compensated the [finance companies] for the bad debts because the [finance companies] ‘covered all its costs and earned a profit during the period in issue.’ Home Depot’s Post-Hearing Brief at 21. As discussed, however, the fees received from Home Depot were only one source of income for the [finance companies]. They also received substantial interest income and late fees from their cardholders. Consequently, the fact that the [finance companies] made a profit during the subject period does not establish, or even suggest, that Home Depot fully compensated the [finance companies] for the expected bad debts. In short, there is nothing proving the amount of the bad debt component included in the fees, and nothing tying that undeterminable amount to the actual bad debts incurred by the [finance companies].”
(Footnote omitted.) We agree with the ALJ’s conclusion that there is simply no evidence demonstrating that Home Depot’s payment of the service fee to the finance companies compensated the finance companies in full, or even in substantial part, for their bad-debt losses. Thus, we cannot agree with Home Depot that its failure to receive the full purchase price for its sales under the PLCC program because of its payment of a service fee to the finance companies sufficiently distinguishes this case from Wells Fargo so as to confer on Home Depot an entitlement to a refund of sales tax that, in Wells Fargo, we said did not exist under the bad-debt regulation.
Home Depot contends that the denial of a refund in this case based on the Department’s construction of the bad-debt regulation would violate the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV, § 1. Specifically, it argues that there is no rational basis for drawing a distinction under the bad-debt regulation between a retailer that finances its own credit-card program and one that, like Home Depot, enters into agreements with other companies for those companies to provide the financing for its customers’ purchases. The Department responds that Home Depot is not similarly situated to retailers that finance their customers’ purchases and that there are sound policy reasons for distinguishing between such retailers and Home Depot with regard to the application of the bad-debt regulation.
As to equal-protection challenges to tax laws, our supreme court has written that “[a] party challenging a tax statute as unconstitutionally discriminatory must show that the discrimination embodied in the taxing statute is unreasonable and must negate every factor offered as a reasonable basis supporting the classification.” State v. Alabama Mun. Ins. Coi~p., 730 So.2d 107, 111 (Ala.1998). “Taxpayers arguing that a state taxation statute violates the Equal Protection Clause of the Federal Constitution carry a heavy burden.” Id. at 112.
We agree with the Department that Home Depot is not similarly situated to other retailers that finance and administer their own credit programs. Unlike such retailers, Home Depot received the purchase price at the time purchases were made under the PLCC program, not in increments over time. Moreover, because *797 Home Depot was not required to refund to the finance companies the purchase price for purchases for which its customers under the PLCC program did not pay the finance companies, Home Depot bore no risk of its customers’ defaults whatsoever. Simply put, Home Depot was not affected in any discernible way at the time its customers utilizing the PLCC program failed to pay the finance companies for their purchases. Thus, we cannot conclude that, with regard to sales-tax refunds, the differing treatment of Home Depot and other retailers that provide their own financing for purchases is irrational or in any way unfair. In this regard, we agree with the Supreme Court of Ohio, which rejected Home Depot’s equal-protection argument in a case involving the same circumstances as those in the present case:
“First, Home Depot contends that the guarantee of equal protection in the Untied States and Ohio Constitutions require that it be treated the same as those vendors who themselves extend credit to their customers. Under the statute, the latter qualify for the bad-debt deduction.
“This argument fails because vendors who extend credit themselves are not, with respect to bad debt, similarly situated to vendors like Home Depot, who hire financial institutions to extend credit. That is so because, as already discussed, vendors that extend credit themselves assume the risk of loss along with the other burdens of lending and collecting. As the testimony in this case establishes, Home Depot avoided such burdens when it hired GE to issue private-label credit cards. Quite simply, there is no requirement of equal treatment of differently situated persons.”
Home Depot USA, Inc. v. Levin, 121 Ohio St.3d 482, 486, 905 N.E.2d 630, 634 (2009). See also Home Depot USA, Inc. v. State Dep’t of Revenue, 151 Wash.App. at 926-29, 215 P.3d at 230-32 (rejecting Home Depot’s equal-protection challenge in a case involving the same issue as the present case); In re Sales Tax Claim for Refund of Home Depot, 198 P.3d at 905 (same); and Home Depot U.S.A., Inc. v. Indiana Dep’t of State Revenue, 891 N.E.2d 187, 191 n. 7 (Ind. Tax Ct.2008) (same).
Home Depot also contends that the Department’s construction of the bad-debt regulation violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, and the guaranty of due process contained in the Alabama Constitution, Ala. Const.1901, Art. I, § 6. Specifically, it argues that “allowing the Department to retain sales tax payments on defaulted transactions, and denying the aggrieved retailer any relief, in effect transforms the State’s sales tax into a tax on consumer defaults” and that, “[wjhen a consumer defaults on a credit card account, there is no legitimate rationale or basis for imposing a tax on the retailer with respect to that transaction.”
State tax provisions do not violate due process unless they are arbitrary and irrational. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (“It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.”).[3] We conclude that the De *798 partment’s interpretation of the bad-debt regulation is neither arbitrary nor irrational. Particularly, as stated above with regard to Home Depot’s equal-protection challenge, we find that retailers that establish credit accounts for their customers and bear the risk of loss on those accounts are in a much different position than retailers that, like Home Depot, are paid up front for all purchases made by their customers and do not bear any risk of default on those purchases. The refusal of the Department to provide a refund of sales taxes paid by the latter group of retailers is imminently reasonable, given that those retailers did not bear the risk of loss with regard to credit payments and that the amount those retailers were paid for the purchases, including applicable sales taxes, does not dimmish on the basis of their customers’ default on their credit accounts. We note that this court is not the only court to reject Home Depot’s due-process challenge under virtually identical facts. See, e.g., Home Depot USA, Inc. v. Levin, 121 Ohio St.3d at 487, 905 N.E.2d at 634-35; and Home Depot USA, Inc. v. State Dep’t of Revenue, 151 Wash.App. at 929, 215 P.3d at 232.
Finally, Home Depot argues that to deny a refund in this case would result in unjust enrichment to the State of Alabama because, according to Home Depot, it paid sales taxes on goods for which, ultimately, its customers failed to pay. We disagree. The transactions giving rise to the refund petition in this case constituted completed sales with regard to Home Depot. Home Depot’s customers received the object of the purchase, and Home Depot was paid for the purchase. The customers’ failure to pay the financing companies for their purchases did not in any way change the fact that Home Depot was paid for the purchases, and there is no evidence in the record indicating that Home Depot refunded the purchase price to the financing companies and recovered the items for which the purchaser failed to pay. Thus, if anything, awarding Home Depot the refund that it seeks in this case would result in unjust enrichment to Home Depot.
Based on the foregoing, we conclude that the Department’s bad-debt regulation did not provide a basis on which to grant Home Depot’s petition for a refund of sales tax. As a result, we reverse the circuit court’s judgment, and we remand the cause for the entry of a judgment affirming the Department’s denial of Home Depot’s refund petition.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

. Tim Russell, the former Commissioner of Revenue of the State of Alabama, was a party to the action in the circuit court in his official capacity. Magee, the current commissioner, was substituted for Russell. See Rule 43(b), Ala. R.App. P.

. The finance companies were permitted under the contracts to charge back accounts to Home Depot under limited circumstances. Simply incurring a loss from a customer’s failure to pay on an account was not one of those circumstances.

. Neither party contends that the due-process guaranty of the Alabama Constitution calls for *798 a different analysis in the present case than the analysis called for under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.