HOME DEPOT U.S.A., INC., Petitioner,

v.

INDIANA DEPARTMENT OF STATE REVENUE, Respondent.

No. 49T10–0703–TA–11.

Tax Court of Indiana.

July 28, 2008.

Jeffrey S. Dible, Michael T. Bindner, Robert L. Hartley, Jennifer L. Vanlandingham, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Jennifer E. Gauger, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

## ORDER ON PARTIES' CROSS– MOTIONS FOR SUMMARY JUDGMENT

FISHER, J.

Home Depot U.S.A., Inc. (Home Depot) appeals from the final determination of the Indiana Department of State Revenue (Department) denying it a refund of state gross retail tax (sales tax) paid between February 1, 1999 and July 31, 2003 (the period at issue). The matter is currently before the Court on the parties' cross-motions for summary judgment. The issue for the Court to decide is whether Home Depot is entitled to a sales tax

refund pursuant to Indiana Code § 6–2.5–6–9.

## FACTS

The following facts are undisputed. Home Depot, a national home improvement retail chain, does business in Indiana. During the period at issue, Home Depot offered its customers the option of purchasing merchandise with "private label" credit cards (i.e., credit cards that bore the name and logo of Home Depot and could only be used at Home Depot or its affiliated stores).

Home Depot's private label credit card program was owned and operated by several financial institutions ("finance companies"). Pursuant to the agreements between Home Depot and the finance companies, Home Depot made the credit card application forms available to its customers in its stores and then submitted the completed applications to the finance companies. The finance companies, in turn: 1) screened and processed the applications; 2) issued credit cards to approved customers; and 3) performed all other activities related to the servicing of the credit cards, including billing and collection. The agreements further specified that:

> [The finance companies are] the sole and exclusive owner[s] of all [credit card] Accounts ... and shall be entitled to receive all payments made by Cardholders on Accounts. [Home Depot] acknowledges and agrees that it has no right, title or interest in any of the foregoing and no right to any payments made by Cardholders on Accounts or any proceeds in respect of the Accounts. All collection procedures shall be under the sole control and discretion of [the finance companies.]

> *       *       *       *       *       *

> All credit losses on Accounts shall be solely borne at the expense of [the finance companies] and shall not be passed on to [Home Depot].

*(See, e.g.,* Pet'r Designated Evid. Ex. 12 §§ 3.03, 6.02.)

Each day, Home Depot transmitted information to the finance companies relating to the private label credit card charges made that day and the sales tax attributable thereto. Within two business days, the finance companies would remit payment to Home Depot for the specified charges and taxes. Pursuant to the agreements between Home Depot and the finance companies, however, the finance companies were authorized to deduct a service fee from the payments remitted to Home Depot.[1]

With respect to the Home Depot credit card accounts that had been defaulted upon and were therefore uncollectible, the

---

1. During the period at issue, the service fees ranged from zero to 13.8% of the total amount of the transaction. (*See* Pet'r Designated Evid. Exs. 12, 13, 14 at Schedules 5.03; Pet'r Br. In Supp. of Mot. for Summ. J. (hereinafter, Pet'r Br.) at 7–8.) The variations in the service fees essentially reflected the credit card holder's credit status and time period within which it had to pay on its account. Indeed, as Home Depot's Director of Credit Legal explained in an affidavit:

> When a [finance company] negotiates a private label credit card program agreement with a major retailer such as Home Depot,

> [it] proposes a combination of terms and conditions, including the interest rate and late fees ... to charge to customers and the service fee ... [it] require[s] the retailer to pay.... Generally, the higher the interest rate on the credit card account and the more interest and late fees the [finance company] expects to collect [from the customer], the lower the ... service fee[s] that the [finance company] will propose to the retailer[.]

(Pet'r Designated Evid. Ex.1 ¶ 15.) The service fees were subject to adjustment by the finance companies every six months.

finance companies claimed "bad debt" deductions on their federal income tax returns, pursuant to section 166 of the Internal Revenue Code, during the period at issue.[2] On its federal income tax returns, Home Depot deducted the service fees it paid to the finance companies as a business expense pursuant to section 162 of the Internal Revenue Code.[3]

On September 19, 2003, Home Depot filed a claim with the Department seeking a refund of the $249,152.42 of Indiana sales tax it had remitted during the period at issue on purchases made by customers who used their Home Depot credit cards but then defaulted on their accounts with the finance companies. On December 4, 2006, the Department issued a final determination denying Home Depot's claim for refund.

Home Depot initiated this original tax appeal on March 2, 2007. On October 2, 2007, both Home Depot and the Department filed motions for summary judgment. The Court conducted a hearing on the parties' motions on February 11, 2008. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

This Court reviews the Department's denial of claims for refund *de novo*. IND. CODE ANN. § 6–8.1–9–1(d) (West 2008). Accordingly, the Court is not bound by either the evidence presented, or the issues raised, at the administrative level. *See Williams v. Indiana Dep't of State Revenue*, 742 N.E.2d 562, 563 (Ind. Tax Ct.2001). Summary judgment will be granted if there are no genuine issues of material fact and the moving party is enti-

tled to judgment as a matter of law. Ind. Trial Rule 56(C). Cross-motions for summary judgment do not alter this standard. *Williams*, 742 N.E.2d at 563.

## DISCUSSION AND ANALYSIS

■ Indiana imposes an excise tax, known as the state sales tax, on retail transactions made within the state. IND. CODE ANN. § 6–2.5–2–1(a) (West 2008). "The person who acquires property in a retail transaction is liable for the tax on the transaction and ... shall pay the tax to the retail merchant as a separate added amount to the consideration in the transaction." A.I.C. § 6–2.5–2–1(b). The retail merchant then remits the collected taxes to the Department on a monthly basis. IND.CODE ANN. § 6–2.5–6–1 (West 2008).

To determine how much sales tax it must remit each month, the retail merchant multiplies its gross retail income from taxable transactions made during that month by the applicable sales tax rate. *See* IND.CODE ANN. § 6–2.5–6–7 (West 2008). In so doing, however, Indiana Code § 6–2.5–6–9 allows the retail merchant to adjust for bad debts or uncollectible receivables. During the period at issue, this statute provided:

> In determining the amount of [sales] tax[ ] which he must remit ... a retail merchant shall deduct from his gross retail income from retail transactions made during a particular reporting period, an amount equal to his receivables which:
>
> (1) resulted from retail transactions in which the retail merchant did not col-

2. More specifically, the finance companies reported these deductions on line 15 of their federal income tax returns (Forms 1120), entitled "Deductions: Bad debts." (Pet'r Br. at 9–10; Pet'r Designated Evid. Ex. 10.)

3. Home Depot reported these deductions on line 26 of its Forms 1120, entitled "Deductions: Other deductions." (Pet'r Br. at 10; Pet'r Designated Evid. Ex. 9.)

lect the [sales] tax from the purchaser;

(2) resulted from retail transactions on which the retail merchant has previously paid the [sales] ... tax liability to the [D]epartment; and

(3) were written off as an uncollectible debt for federal tax purposes during the particular reporting period.

IND.CODE ANN. § 6–2.5–6–9(a) (West 1999). The issue in this case is whether, during the period at issue, Home Depot qualified for this deduction. The parties agree that the first two prongs of the statute are not at issue; thus, the parties' dispute centers on whether the third prong has been met.

Home Depot asserts that, in substance, it—and not the finance companies—has borne the "full economic loss" on the uncollectible credit card accounts. More specifically, Home Depot asserts that in paying the service fees to the finance companies, it fully "reimbursed" them, in advance, for all anticipated losses due to uncollectible credit card accounts.[4] In turn, Home Depot explains that Indiana Code § 6–2.5–6–9(a)(3) merely provides "that the bad debt be 'written off as an uncollectible debt for federal tax purposes' [and does not] specify[ ] by whom [or under what] ... section of the Internal Revenue Code ... the income tax deduction [is to] be claimed."[5] (Pet'r Br. In Opp'n to Resp't Cross–Mot. for Summ. J. (here-

inafter, Pet'r Br. # 2) at 2 (footnote added).) (See also Pet'r Br. In Supp. of Mot. for Summ. J. (hereinafter, Pet'r Br.) at 18, 20 (reasoning that under Indiana Code § 6–2.5–6–9(a)(3), neither the identity of the taxpayer that wrote off the bad debt losses nor the section under which the bad debt was written off "is important").) As a result, Home Depot maintains that it is entitled to the deduction because it wrote off the loss it bore on the uncollectible credit card accounts for federal tax purposes by deducting the service fees as a business expense under section 162 of the Internal Revenue Code. (See Pet'r Br. at 18–20.) In the alternative, Home Depot argues that it is still entitled to the deduction because the uncollectible credit card accounts were "written off as an uncollectible debt for federal tax purposes," albeit by the finance companies. (See Pet'r Br. at 18–20.)

The Department argues, on the other hand, that in order for Home Depot to receive the deduction, *Home Depot* was required to write off the credit card accounts as uncollectible debt for federal tax purposes. Furthermore, it explains that in order for a receivable to be "written off as an uncollectible debt for federal tax purposes," the receivable must be written off *under section 166 of the Internal Revenue Code.* As a result, the Department asserts that Home Depot did not qualify for the

---

**4.** The Court notes, however, that Home Depot's designated evidence does not clearly establish this proposition. (*Cf.* Pet'r Designated Evid. Ex. 1 ¶ 22 (affidavit of Home Depot's Director of Credit Legal asserting that in paying the service fees, Home Depot bore the full economic loss on the uncollectible credit card accounts) *with* Pet'r Designated Evid. Exs. 11 ¶¶ 5–6 (affidavit from vice president of one of the finance companies indicating that bad debt loss was only one of several components which made up the overall service fee charge) and 12, 13, 14 (agreements between Home Depot and the finance companies which are

silent as to what factors are considered in determining the service fees or what portion of the service fees represent reimbursement for bad debt losses).)

**5.** In other words, Home Depot argues that Indiana Code § 6–2.5–6–9(a)(3) "addresses the proper timing of the deduction." (Pet'r Br. at 17–18 (asserting that (a)(3) merely ensures "that a sales tax deduction is not prematurely claimed before the debt owed by a customer has become truly worthless, with no reasonable prospect of recovery").)

deduction at issue: Home Depot did not write off the credit card accounts as uncollectible debt under section 166 of the Internal Revenue Code. (Resp't Br. In Supp. of Cross[-]Mot. for Summ. J. (hereinafter, Resp't Br.) at 6.) The Department is correct.

Nearly four years ago, the Indiana Supreme Court held that when a retail merchant computes its bad debt deduction under Indiana Code § 6–2.5–6–9, it is limited to deducting that portion of the amount of its receivables equal to the amount actually written off for federal income tax purposes. *Indiana Dep't of Revenue v. 1 Stop Auto Sales, Inc.*, 810 N.E.2d 686, 690 (Ind. 2004). More specifically, the Supreme Court explained that when a retail merchant writes off a receivable as uncollectible, it is required to reduce the amount written off by the value of any repossessed collateral when it calculates its bad debt deduction under section 166 of the Internal Revenue Code. *Id.* at 688 (citing, *inter alia*, Treas. Reg. § 1.166–2(a) (as amended in 1993)). The Supreme Court held that this federal rule for calculating the amount of the federal bad debt deduction applies to calculating the sales tax deduc-

tion under Indiana Code § 6–2.5–6–9. *See id.* at 689. Indeed, "[i]f the Legislature did not want [the retail merchant] to use Internal Revenue Code Section 166 mathematics [in calculating the amount of the deduction], [ ] it would not have referenced federal tax law at all; it would have simply provided that the receivables were written off as an uncollectible debt." *Id.* at 689. Thus, the Supreme Court implicitly acknowledged that under Indiana Code § 6–2.5–6–9(a)(3), when a retail merchant "writes off a receivable as an uncollectible debt for federal tax purposes," the retail merchant must write off the receivable as uncollectible debt for federal tax purposes under section 166 of the Internal Revenue Code.[6]

## CONCLUSION

■ Home Depot would be entitled to the deduction under Indiana Code § 6–2.5–6–9 if it wrote off the uncollectible credit card accounts for federal tax purposes under section 166 of the Internal Revenue Code. *See* A.I.C. § 6–2.5–6–9(a); *1 Stop Auto*, 810 N.E.2d at 689–90. Home Depot did not and therefore it is not entitled to the deduction.[7] Consequently,

6. This is supported by the fact that, in 2003, the legislature amended Indiana Code § 6–2.5–6–9(a)(3) to read "were written off as an uncollectible debt for federal tax purposes *under Section 166 of the Internal Revenue Code[.]*" *See* P.L. 257–2003, § 30 (emphasis added) (eff.1–1–2004). Given the ruling in *1 Stop Auto*, this Court finds that the amendment was intended to express more clearly the legislature's intent in enacting the law in the first place. *See United Nat'l Ins. Co. v. DePrizio*, 705 N.E.2d 455, 460 (Ind.1999) (stating that while a statutory amendment generally raises the presumption that the legislature intended to change the statute's meaning, the presumption is rebutted if it appears that the amendment was passed in order to express the original intent more clearly).

7. On a final note, Home Depot, while never explicitly labeling it as such, appears to raise an equal protection argument. Indeed, it simply states that it "should be entitled to the same treatment as vendors who extend their own credit and service their own accounts, because Home Depot suffers the exact same economic loss from its bad debts as that suffered by vendors who own their credit accounts. There is no reasonable basis for treating Home Depot differently." (*See* Pet'r Br. at 14, 24–25.)

This Court has explained that an equal protection analysis (under both federal and state Constitutions) is implicated only if an individual has been treated differently from other similarly situated persons. *See UACC Midwest, Inc. v. Indiana Dep't of State Revenue*, 667 N.E.2d 232, 238–239 (Ind. Tax Ct.1996). Home Depot, however, is not similarly situat-

summary judgment is GRANTED in favor of the Department and AGAINST Home Depot. The parties shall bear their own costs.

SO ORDERED.

ed to vendors who own and service their own credit card programs: it does not finance the sales tax on installment contract purchases which are eventually defaulted upon and therefore it cannot write those receivables off as uncollectible debt for federal tax purposes. Thus, Home Depot's equal protection rights are not implicated in this case.