287 P.3d 97

**HOME DEPOT USA, INC.,**
**Plaintiff/Appellant,**

v.

**ARIZONA DEPARTMENT OF**
**REVENUE, Defendant/Appellee.**

**No. 1 CA–TX 11–0004.**

Court of Appeals of Arizona,
Division 1, Department T.

Oct. 2, 2012.

Steptoe & Johnson LLP by Pat Derdenger Bennett Evan Cooper, Phoenix and Gibson, Dunn & Crutcher LLP by Randy M. Mastro *, Jennifer H. Rearden *, Georgia K. Winston *, New York, NY, Evan S. Tilton *,* admitted pro hac vice, Dallas, TX, Attorneys for Plaintiff/Appellant.

Thomas C. Horne, Arizona Attorney General by Scot G. Teasdale, Assistant Attorney General, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

SWANN, Judge.

¶ 1 This is a transaction privilege tax case. Home Depot USA, Inc. ("Taxpayer") challenges the superior court's entry of summary judgment denying its claim for a tax refund based on bad debt deductions under A.A.C. R15–5–2011(A). For the reasons that follow, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

¶ 2 Taxpayer operates retail home-improvement stores throughout the United States, including Arizona. This litigation arises out of Taxpayer's claim for tax refunds based on deductions for bad debts arising under its private-label credit card ("PLCC") program.

¶ 3 Taxpayer entered contracts with three related companies—General Electric Capital Corporation, GE Capital Financial, Inc., and Monogram Credit Card Bank of Georgia (the "Finance Companies")—for the provision of PLCCs to its customers. The contracts contain substantially similar provisions, except that the Monogram program issued cards to general retail customers, and the other pro-

grams issued cards to business customers. Customers wishing to use a PLCC applied to one of the Finance Companies for credit. After reviewing an applicant's creditworthiness, the relevant company exercised its discretion to determine whether to extend credit and then established a credit account for approved customers.

¶ 4 When a PLCC customer makes a purchase from Taxpayer or one of its affiliated entities, the relevant Finance Company forwards to Taxpayer the amount of the purchase, including the amount of the transaction privilege tax that is built into the sale price, less a service fee. From this amount, Taxpayer pays the applicable transaction privilege tax to the State of Arizona. Taxpayer deducts the service fee on its federal income tax form as "other deductions," not as "bad debts." Meanwhile, the Finance Companies deduct losses from unpaid accounts as bad debts on their federal income tax returns.

¶ 5 In September 2003, Taxpayer filed a bad debt refund claim with the Arizona Department of Revenue (the "Department") for $1,449,496.11 with respect to transaction privilege taxes paid from August 1, 2000, to July 31, 2003, on transactions in which PLCC customers had defaulted on purchases financed through the Finance Companies. Taxpayer based its refund calculation on the total taxable sales the Finance Companies had written off. To derive this figure, Taxpayer deducted from the total taxable sales the "subsequent collections," "finance charges," and "late fees," and then eliminated nontaxable sales.

¶ 6 In August 2004, the Department denied the refund claim. Taxpayer exhausted its administrative remedies and appealed by filing a complaint in the Arizona Tax Court pursuant to A.R.S. § 42–1254(C). Taxpayer then filed a motion for partial summary judgment on its entitlement to the bad debt refund, and the Department filed a cross-motion for summary judgment. The tax court granted the Department's motion, denied Taxpayer's motion, and entered final judgment in March 2011. This appeal followed.

## DISCUSSION

¶ 7 Summary judgment is warranted if "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). We review the tax court's summary judgment rulings de novo. *Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 72, ¶ 6, 97 P.3d 896, 897 (App.2004). We also review de novo issues of statutory interpretation and the tax court's application of the law. *Open Primary Elections Now v. Bayless*, 193 Ariz. 43, 46, ¶ 9, 969 P.2d 649, 652 (1998); *State Comp. Fund v. Yellow Cab Co.*, 197 Ariz. 120, 122, ¶ 5, 3 P.3d 1040, 1042 (App.1999).

### I. A VENDOR MUST BE OWED A BAD DEBT TO CLAIM THE BAD DEBT DEDUCTION UNDER A.A.C. R15–5–2011 (A).

¶ 8 Arizona imposes a transaction privilege tax on the privilege of engaging in business in the state. *Ariz. State Tax Comm'n v. Sw. Kenworth, Inc.*, 114 Ariz. 433, 436, 561 P.2d 757, 760 (App.1977). The legal incidence of the tax is on the seller, though the seller may pass the cost of the tax on to its customers. *Karbal v. Ariz. Dep't of Revenue*, 215 Ariz. 114, 117, ¶ 11, 158 P.3d 243, 246 (App.2007). In this case, Taxpayer is subject to the tax under the retail classification because it is in the business of selling tangible personal property at retail. *See* A.R.S. § 42–5061(A). The tax base for this classification is "the gross proceeds of sales or gross income derived from the business." *Id.*

¶ 9 Under A.A.C. R15–5–2011, taxpayers may claim bad debt deductions against the transaction privilege tax under certain conditions. The regulation provides in relevant part:

A. The deduction of a bad debt shall be allowed from gross receipts if the following conditions apply:

    1. The gross receipts from the transaction on which the bad debt deduction

is being taken have been reported as taxable;

2. The debt arose from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money; and

3. All or part of the debt is worthless.

¶ 10 The crux of this appeal is whether A.A.C. R15–5–2011(A) (2) requires that the taxpayer be the creditor in the "debtor-creditor relationship." The principles of statutory construction apply to interpretations of regulations. *Kimble v. City of Page*, 199 Ariz. 562, 565, ¶ 19, 20 P.3d 605, 608 (App.2001). Accordingly, "we look to the plain language as the most reliable indicator of meaning," and "give effect to each sentence and word so that provisions are not rendered meaningless." *Powers v. Carpenter*, 203 Ariz. 116, 118, ¶ 9, 51 P.3d 338, 340 (2002); *Comm. for Pres. of Established Neighborhoods v. Riffel*, 213 Ariz. 247, 249, ¶ 8, 141 P.3d 422, 424 (App.2006). We strictly construe tax deductions. *Ariz. Dep't of Revenue v. Raby*, 204 Ariz. 509, 511, ¶ 16, 65 P.3d 458, 460 (App.2003).

¶ 11 The Taxpayer–Finance Company contracts provide that the Finance Companies own all the credit accounts established for Taxpayer's PLCC customers and are entitled to receive all payments made by cardholders on accounts. Each contract provides: "All credit losses on Accounts shall be solely borne at the expense of [the Finance Company] and shall not be passed on to Retailer except for any chargebacks[.]" Taxpayer therefore does not suffer any direct loss associated with delinquent accounts, nor does it stand to benefit if those accounts are ultimately collected.

¶ 12 Taxpayer contends that because A.A.C. R15–5–2011(A) does not expressly require that the taxpayer actually be the creditor for purposes of establishing the debtor-creditor relationship, the tax court improperly engrafted a fourth condition onto the regulation by requiring that the taxpayer suffer the bad debt loss.

¶ 13 We rejected a similar proposed construction of A.A.C. R15–5–2011 in *Daimler-Chrysler Services North America, LLC v. Arizona Department of Revenue*, 210 Ariz. 297, 110 P.3d 1031 (App.2005). In *Daimler-Chrysler*, the appellant finance company also argued that the regulation does not specify who may take the deduction. *Id.* at 301, ¶ 10, 110 P.3d at 1035. We held that though A.A.C. R15–5–2011 contains no express requirement that the taxpayer be a retailer, its use of the term "gross receipts"—defined under A.R.S. § 42–5001(7) as being derived from the "retail sales of retailers"—necessarily implied such a requirement. *Id.* at 302, ¶ 16, 110 P.3d at 1036. We concluded that the finance company could not take the deduction because it was not a retailer. *Id.* at 303, ¶¶ 19–20, 110 P.3d at 1037.

¶ 14 As in *DaimlerChrysler*, we interpret A.A.C. R15–5–2011(A) with an eye toward coordination among related provisions, including A.A.C. R15–5–2011(F).[1] According to subsection (F), "[a]ny recovery of a bad debt subsequent to a bad debt deduction shall be reported as taxable gross receipts when received." If we were to adopt Taxpayer's argument, then Taxpayer would reap the benefit of the bad debt deduction while simultaneously avoiding the risk of future tax liability on amounts later collected. Taxpayer's proposed application of Arizona's regulatory scheme would therefore render subsection (F) meaningless—a construction that our rules of interpretation direct us to avoid.

¶ 15 Construing a provision similar to subsection (F), an Oklahoma appellate court held that Oklahoma's refund law "implicitly requires the owner of the bad debt account to be the entity allowed the deduction where it also requires the owner to report subsequent collections of bad debt accounts as income." *In re Sales Tax Claim for Refund of Home Depot*, 198 P.3d 902, 904, ¶ 7 (Okla.Civ.App. 2008). Likewise, the Alabama Court of Civil Appeals found that the Alabama regulation's reference to a retailer's collection of amounts due on sale "implies that the bad debt at

---

1. The Department contends that Taxpayer's arguments are inconsistent with A.A.C. R15–5–2011(E). But by its terms, subsection (E) applies to conditional or installment sales, neither of which is at issue here.

issue is debt owned by the retailer itself because, in situations involving the third-party financing of purchases from a retailer, a retailer would not be in a position to 'recover [ ] . . . amounts previously claimed as bad debt credits or refunds.'" *Magee v. Home Depot U.S.A., Inc.*, 95 So.3d 781, 793–94 (Ala. Civ.App.2011) (quoting Ala. Admin. Code r. 810–6–4–.01(6)).

¶ 16 We agree with the Department that Taxpayer had no bad debts for purposes of A.A.C. R15–5–2011. Taxpayer sold any interest it might have had in the accounts to the Finance Companies in consideration for payment of the full value of the sale: the price of the goods plus the cost of the transaction privilege tax—less the service fee. Because Taxpayer received the full amount it was owed, there were no debts—much less bad debts-that served to reduce the gross amount that it realized from its sales of goods. *See Home Depot USA., Inc. v. State, Dep't of Revenue*, 151 Wash.App. 909, 215 P.3d 222, 228, ¶ 33 (2009) (holding that because Home Depot had sold its rights to the account, it had no right to collect any unpaid sums from the buyer); *In re Home Depot U.S.A., Inc. v. Tax Appeals Tribunal*, 68 A.D.3d 1571, 1573, 893 N.Y.S.2d 313 (N.Y.App.Div.2009) ("[I]nasmuch as the debts in question were owed to the finance companies and petitioner was paid in advance by the finance companies, petitioner did not actually have any uncollectible receipts."); *Home Depot U.S.A., Inc. v. Dir., Div. of Taxation*, 25 N.J.Tax 221, 226 (N.J. Tax Ct.2009) ("[W]hether or not its customer eventually defaulted on the credit card obligation, appellant [Home Depot] received the same payment with respect to the transaction, and paid the same service fee to the finance companies. Accordingly, as a matter of law, appellant is ineligible for a refund.").

¶ 17 The bad debt deduction serves to relieve a taxpayer from the burden of taxation on amounts it reports but does not actually receive. In essence, the deduction remedies past overcollections of tax. Here, because Taxpayer received the amounts upon which the tax was computed, there was no overtaxation and no need for a remedy.

## II. THE SERVICE FEES DO NOT ENTITLE TAXPAYER TO CLAIM THE BAD DEBT DEDUCTION BECAUSE THEY DID NOT COMPENSATE FOR BAD DEBT.

■ ¶ 18 Taxpayer next argues that the service fees it paid reimbursed the Finance Companies for anticipated bad debts on a portfolio-wide basis. According to Taxpayer, its payments toward the Finance Companies' bad debt losses should entitle it to a bad debt deduction. We disagree. The New Jersey court rejected the same argument in *Home Depot U.S.A., Inc. v. Director, Division of Taxation*, 25 N.J.Tax 221 (N.J.Super.Ct.App.Div.2009):

> The Tax Court properly rejected, both factually and legally, appellant's position that it was entitled to a refund of sales tax paid on uncollectible credit card purchases because it funded the finance companies' projected bad debt losses through payment of service fees. Appellant bore no direct risk with respect to non-payment of its customers' credit card indebtedness, did not suffer any losses as a result of the defaults to the finance companies, and presented no competent evidence that its service fee payments constituted bad debt losses for which a sales tax refund would be appropriate. . . .

¶ 19 Here, the tax court rejected Taxpayer's portfolio-wide approach as inconsistent with A.A.C. R15–5–2011(C). But even if Taxpayer's interpretation were consistent with that subsection, we would still reject Taxpayer's argument because the record contains no evidence that the service fees actually reimburse the finance companies for bad debts.

### A. The Record Fails To Support Taxpayer's Claim That the Service Fees Reimburse the Finance Companies for Bad Debt Losses.

¶ 20 Taxpayer contends that it "fully compensated" the Finance Companies for all bad debt losses incurred because the "Finance Companies' income in connection with administering [Taxpayer's] program during the Refund Period exceeded the costs of doing so,

including all bad debts[.]" But Taxpayer's contracts with the Finance Companies are silent as to what the service fees pay for. The contracts provide different service fee rates for different types of accounts. On at least some consumer transactions, Taxpayer pays no service fees at all.

¶ 21 The Vice President of Portfolio Risk Management for one of the Finance Companies testified that revenue streams from service fees (from Taxpayer) and interest and late fees (from customers) cover the Finance Companies' expenses, including operating expenses, plant facilities, equipment, costs of borrowing, and bad debt losses. Revenue streams are fungible. In other words, the Finance Companies receive revenue from multiple sources, aggregate that revenue, and use it to cover operating expenses and losses. The fact that the Finance Companies took in more revenue than the cost of the program is hardly surprising, given their commercial motive to profit from financing Taxpayer's sales. Taxpayer presented no evidence, however, that the Finance Companies look to Taxpayer to recoup their bad debt losses.

¶ 22 Taxpayer complains that the disallowance of its bad debt deductions unjustly allows the state to retain taxes because neither Taxpayer nor the Financing Companies are eligible to claim the bad debt deduction. We perceive no such injustice. The Finance Companies do not pay the transaction privilege tax. There is nothing in Arizona law to suggest that when one entity is unable to avail itself of the deduction, it should be able to transfer that deduction to another entity.

### B. *Only Cash Discounts May Reduce Gross Income from Retail Sales.*

¶ 23 Taxpayer's portfolio argument also fails because it is inconsistent with the relevant statutes. A.R.S. § 42–5061(A) provides that the transaction privilege tax is based upon the "gross proceeds of sales." A.R.S. § 42–5001(5) defines "gross proceeds of sales" as "the value proceeding or accruing from the sale of tangible personal property without any deduction on account of the cost of property sold, expense of any kind or losses, but cash discounts allowed and taken

on sales are not included as gross income." Therefore, Taxpayer is allowed to lower the tax base only with "cash discounts"—not with fees it pays to its vendors as part of the cost of doing business.

¶ 24 Taxpayer's tax liability is measured by the actual revenues it receives from sales. Under A.R.S. § 42–5001(5), Taxpayer may not claim service fees as bad debts to reduce its tax base, just as it could not claim the cost of an insurance policy against such losses. Under our statutes, the retailer's choice is simple: experience the loss and receive the deduction, or avoid the loss and forgo the deduction.

### III. · *TAXPAYER AND THE FINANCE COMPANIES DO NOT CONSTITUTE "A SINGLE TAXPAYER UNIT."*

■ ¶ 25 Taxpayer advances an alternative theory that it should be permitted the deduction because it functions as a single taxpayer unit with each of the Finance Companies within the meaning of A.R.S. § 42–5001(18). According to Taxpayer's reasoning, the unit experiences the losses associated with delinquent accounts owned by the Finance Companies. Again, we disagree.

¶ 26 A.R.S. § 42–5001(18) defines a "taxpayer" as "any person who is liable for any tax which is imposed by this article." A "person" is "an individual, firm, partnership, joint venture, association, corporation ... and *any other group or combination acting as a unit,* and the plural as well as the singular number." A.R.S. § 42–5001(8) (emphasis added).

¶ 27 As a threshold matter, we disagree that two corporations that have not formed a joint venture or partnership qualify as an "other group or combination acting as a unit" under A.R.S. § 42–5001(8). Taxpayer's interpretation would read the word "other" out of the statutory definition. We agree with the Maine Supreme Court that

> [t]he reference in the law to "other" groups or combinations is a catch-all phrase, applying to any other possible organizational entities that may be identified; it is not a device to allow separate corpora-

tions to be treated as a single entity under the tax code when such single entity treatment suits their purpose.

*Linnehan Leasing v. State Tax Assessor,* 898 A.2d 408, 414, ¶ 22 (Me.2006) (construing the definition of "person" in Me.Rev.Stat. tit. 36, § 111(3), which includes "any other group or combination acting as a unit," and declining to hold that an automobile dealer and a finance company functioned as a single entity).

¶ 28 Notwithstanding this definitional obstacle, Taxpayer relies on *DaimlerChrysler Services N. Am., LLC v. Department of Treasury,* 271 Mich.App. 625, 723 N.W.2d 569 (2006), *superseded by* Mich. Comp. Laws § 205.54i. In that case, a company financed consumer purchases of vehicles from its affiliated dealers. *Id.* at 570. The finance company would purchase the dealers' sales contracts in exchange for assignment of all the dealers' rights in the contracts. *Id.* at 571. The finance company paid the dealers all amounts due, including the state sales tax, while the dealers remitted the sales tax revenue to the Michigan Department of Treasury. *Id.* at 571.

¶ 29 The finance company contended that it was a taxpayer entitled to the bad debt deduction. *Id.* at 572. The Michigan Court of Appeals agreed and explained that the finance company and its affiliated dealers qualified as a unit because motor vehicle sales "frequently require financing, and ... plaintiff here was the financing company, [so] we conclude that the dealers and plaintiff were 'acting as a unit,' i.e., as a single, taxable entity, for the purpose of the retail sales of automobiles." *Id.* at 575. We find the Michigan case unpersuasive. As noted above, this court has already held that a finance company in similar circumstances is *not* entitled to claim the bad debt deduction. *DaimlerChrysler Servs. N. Am., LLC v. Ariz. Dep't of Revenue,* 210 Ariz. 297, 303, ¶ 20, 110 P.3d 1031, 1037 (App.2005).

¶ 30 Even if the deduction were available under Taxpayer's unit theory, the undisputed facts on the record do not support a finding that Taxpayer and the Finance Companies acted as a unit in this case. Other courts have required a "single unit" claimant to demonstrate an agency relationship or singularity of purpose. *See Home Depot USA., Inc. v. State, Dep't of Revenue,* 151 Wash.App. 909, 215 P.3d 222, 230, ¶ 43 (2009). Here, the only relationship between Taxpayer and the Finance Companies is based on arm's-length contracts, and those contracts specifically disclaim the formation of any partnership, joint venture, principal-agent relationship, or employer-employee relationship. The fact that Taxpayer and the Finance Companies communicate and coordinate on credit standards does not suffice to establish a "single unit." *See id.* (rejecting a similar argument because the entities functioned as "separate companies bound only by a negotiated contract"); *see also Nordstrom Credit, Inc. v. Dep't of Revenue,* 120 Wash.2d 935, 845 P.2d 1331, 1335–36 (1993) (rejecting the unitary business argument because the retailer and the credit company engaged in " 'arm's length' sales transactions within the state of Washington" and a contrary holding would ignore the corporate form).

## IV. ADDITIONAL ISSUES

### A. No "Unjust Enrichment" Resulted from Denial of the Bad Debt Deduction.

¶ 31 Taxpayer argues that allowing the state to retain Taxpayer's transaction privilege taxes despite the customers' failure to pay for goods constitutes unjust enrichment. But the customers' failure to pay the Financing Companies does not change the fact that Taxpayer was paid for the purchases. From a tax standpoint, the situation would be no different if the customers owed the money for purchases to their family members and failed to repay the family members. We therefore conclude that Taxpayer's unjust enrichment claim fails as a matter of law. *See Magee,* 95 So.3d at 798, (rejecting similar unjust enrichment claim because awarding the refund sought would, if anything, result in unjust enrichment to Home Depot).

### B. Taxpayer Has Not Been Deprived of Equal Protection.

¶ 32 Taxpayer further contends that denial of a refund would violate the equal

protection clauses of the United States and Arizona Constitutions. According to Taxpayer, there is no rational basis for the distinction between retailers that finance their own credit card programs and those whose customers' purchases are financed by others.

¶ 33 "An equal protection challenge to a legislative tax classification can succeed only if the taxpayer can demonstrate that the classification is not rationally related to any conceivable legitimate governmental purpose." *U.S. West Commc'ns, Inc. v. City of Tucson,* 198 Ariz. 515, 525, ¶ 40, 11 P.3d 1054, 1064 (App.2000). The challenging party bears the burden to demonstrate that no conceivable basis exists for the disparity in treatment. *Id.* at 526, ¶ 40, 11 P.3d at 1065. If the classification is rational, it will survive scrutiny. *Home Depot USA, Inc. v. State Dep't of Revenue,* 151 Wash.App. 909, 215 P.3d 222, 232, ¶ 49 (2009).

¶ 34 Taxpayer has not met its burden to show that there is no rational basis for the classification. In our view, the classification is inarguably rational. Arizona law allows bad debt deductions to those who fail to realize amounts upon which they have already paid tax. It does not create a windfall for those who realize benefits by selling goods to consumers who default on their debts to others. The distinction efficiently preserves the underlying policy of Arizona law that the transaction privilege tax is levied upon gross receipts. *See Magee,* 95 So.3d at 796; *see also Home Depot USA, Inc. v. Levin,* 121 Ohio St.3d 482, 905 N.E.2d 630, 634–35, ¶¶ 21–23 (2009) (holding that the taxpayer was not similarly situated to vendors that extend credit themselves and assume the risk of bad-debt loss); *Home Depot USA, Inc. v. State Dep't of Revenue,* 151 Wash.App. 909, 215 P.3d 222, 230–32, ¶¶ 44–50 (2009) (rejecting a similar equal protection challenge because the method of business employed by a retailer that bears its own risk of default differs from that of a retailer that transfers a risk of default in exchange for a service fee, even assuming that the fee factors in a portfolio-wide percentage of future defaults); *In re Sales Tax Claim for Refund of Home Depot,* 198 P.3d 902, 905, ¶ 10 (Okla.Civ.App.2008) (holding that the

taxpayer had failed to show that other retailers with similar private credit card agreements are treated differently); *Home Depot U.S.A., Inc. v. Ind. Dep't of State Revenue,* 891 N.E.2d 187, 191 n. 7 (Ind.Tax.2008) (explaining that the taxpayer's equal protection rights were not implicated because the taxpayer was not similarly situated to vendors who own and service their own credit card programs).

C.  *Taxpayer Has Not Been Deprived of Due Process.*

¶ 35 Equally unavailing is Taxpayer's claim that it was deprived of due process under the United States and Arizona Constitutions. The refusal to refund a tax does not deprive a taxpayer of due process unless it is "arbitrary and irrational." *See United States v. Carlton,* 512 U.S. 26, 30, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994).

¶ 36 As explained above, we find no irrationality in A.A.C. R15–5–2011 as interpreted by the Department. "[T]he guarantee of due process does not require that the state allow a bad-debt deduction as a means of preventing an 'unjust enrichment.'" *Home Depot USA, Inc. v. Levin,* 121 Ohio St.3d 482, 905 N.E.2d 630, 634–35, ¶ 23 (2009). Retailers who establish their own credit accounts and bear the risk of loss are not in the same position as retailers who establish credit programs with third parties and receive payment up front without bearing the risk of default.

### CONCLUSION

¶ 37 We affirm the tax court's ruling in all respects. We deny Taxpayer's request pursuant to A.R.S. § 12–348(B) for attorney's fees on appeal. We award the Department its costs on appeal subject to its compliance with ARCAP 21.

CONCURRING: MICHAEL J. BROWN, and PATRICIA K. NORRIS, Judges.